1   Georgia A. Staton, Bar #004863
    Robert R. Berk, Bar #010162
2   JONES, SKELTON & HOCHULI, P.L.C.
    40 North Central Avenue, Suite 2700
3   Phoenix, Arizona  85004
    Telephone:  (602) 263-1700
4   Fax:  (602) 200-7854
    gstaton@jshfirm.com
5   rberk@jshfirm.com

6   Attorneys for Defendant Amazing Lash
    Studio Franchise, LLC and Grant Walsh

7

8              **UNITED STATES DISTRICT COURT**

9                 **DISTRICT OF ARIZONA**

| | |
|---|---|
| 10  THE LEONESIO GROUP, LLC, et al., | NO. 2:16-cv-02295-DLR |
| 11                    Plaintiffs, | **DEFENDANTS AMAZING LASH STUDIO FRANCHISE, LLC AND** |
| 12        v. | **GRANT WALSH'S FIRST AMENDED ANSWER & AFFIRMATIVE DEFENSES TO** |
| 13  AMAZING LASH STUDIO FRANCHISE, | **PLAINTIFFS' FIRST AMENDED** |
| 14  LLC, a Texas limited liability company; and GRANT WALSH, an individual resident of | **COMPLAINT, FILED SUBJECT TO THEIR PENDING MOTION** |
| 15  Texas, | **TO STAY AND COMPEL ARBITRATION OF CERTAIN** |
| 16                  Defendants. | **CLAIMS, AND AMAZING LASH STUDIO FRANCHISE, LLC'S** |
| 17 | **FIRST AMENDED COUNTERCLAIM AGAINST** |
| 18 | **REDLINE ATHLETICS FRANCHISING, LLC** |
| 19 | |
| 20 | JURY TRIAL DEMANDED |
| 21 | |

22        This case involves two state court actions[1] that were consolidated prior to

23  removal to this Court and a pending arbitration proceeding before the American

24  Arbitration Association ("AAA"). Subject to their pending *Motion to Stay and Compel*

25  *Arbitration of Certain Claims* [Doc. #20], Defendants Amazing Lash Studio Franchise,

26           [1] In the original state court proceeding, Cause No. CV2016-002092 was a
27  complaint for damages and injunctive relief, while Cause No. CV2016-006190 was a
    complaint for declaratory judgment. The parties have stipulated to the dismissal of the
28  declaratory judgment action [Doc. # 35].

{00132220-1 }     5185819.1

LLC ("ALSF") and Grant Walsh hereby file their first amended answer and affirmative defenses to Plaintiffs' *First Amended Complaint* that was filed in state court as CV2016-002092 [Doc. #1-3, pg. 379] (the "Complaint"). Defendants incorporate by reference the procedural history set forth in their *Motion to Stay and Compel Arbitration of Certain Claims* [Doc. #20].

Each numbered Paragraph in the answer below corresponds to the Paragraphs as numbered in the Complaint. Defendants deny the allegations and characterizations made in the Complaint, whether express or implied, that are not specifically admitted below.

## I.    DEFENDANTS' FIRST AMENDED ANSWER
## PARTIES

1.    The allegations appear to be accurate; however, Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in Paragraph 1 of the Complaint.  By rule, these allegations stand denied.

2.    The allegations appear to be accurate; however, Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in Paragraph 2 of the Complaint.  By rule, these allegations stand denied.

3.    The allegations appear to be accurate; however, Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in Paragraph 3 of the Complaint.  By rule, these allegations stand denied.

4.    The allegations appear to be accurate; however, Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in Paragraph 4 of the Complaint.  By rule, these allegations stand denied.

5.    The allegations appear to be accurate; however, Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in Paragraph 5 of the Complaint.  By rule, these allegations stand denied.

6.    ALSF admits that it is a limited liability company, organized under the laws of the State of Texas. ALSF further admits that it maintains offices in Maricopa

County, Arizona, but denies that such offices constitute the company's principal place of business or that ALSF is a resident of the State of Arizona.

7.      Defendants admit that ALSF's attorney, Grant Walsh, who is named as a co-defendant in this case, is an individual who resides in the State of Texas.

## JURISDICTION AND VENUE

8.      Defendants admit that the U.S. District Court for the District of Arizona may exercise subject matter jurisdiction with regard to the claims asserted by Plaintiff Redline Athletics Franchising, LLC ("Redline"). However, Defendants contend that that claims asserted by The Leonesio Group, LLC ("TLG"), John Leonesio, Ron Record and United Club Services, LLC ("UCS") are subject to the jurisdiction of the arbitration tribunal already pending before the AAA (AAA Case No. 01 16 0000 8819), pursuant to the findings and orders entered by the Superior Court prior to removal to this Court. Further, Plaintiffs TLG, Leonesio, Record and UCS have already submitted to the jurisdiction of the AAA by asserting claims before the concurrent arbitration tribunal.

9.      Defendants admit that ALSF does business in this judicial district, but denies that co-defendant Grant Walsh does business in this judicial district. Defendants further deny that they committed any wrongful acts in this judicial district and deny the remaining allegations in Paragraph 9 of the Complaint.

10.     Defendants contend that the proper venue for resolution of the disputes involving Plaintiffs TLG, Leonesio, Record and UCS is the concurrent AAA arbitration tribunal in Houston, Texas. Defendants admit that venue is proper in the U.S. District Court for the District of Arizona for the claims and disputes involving Plaintiff Redline, but deny that venue is convenient in this judicial district.

## FACTUAL ALLEGATIONS

11.     The allegations appear to be accurate; however, Defendants are without sufficient information or knowledge to either admit or deny the allegations contained in Paragraph 11 of the Complaint.  By rule, these allegations stand denied.

1    12.    Defendants are without sufficient information or knowledge to either

2 admit or deny the allegations contained in Paragraph 12 of the Complaint.  By rule, these

3 allegations stand denied.

4    13.    ALSF admits that at the direction of TLG and Record in mid-to-late

5 2014, ALSF started conducting some business at 9383 E. Bahia Drive, Suite 115, in

6 Scottsdale, Arizona ("Suite 115"), but denies there was a sublease agreement between

7 ALSF and Redline. ALSF admits that ALSF and Redline shared at various times a

8 computer network where documents and files used in both companies' business were

9 jointly stored on a Network Attached Storage Drive ("NASDrive"). Defendants deny the

10 remaining allegations in Paragraph 13 of the Complaint.

11    14.    Defendants deny the allegations in Paragraph 14 of the Complaint.

12    15.    ALSF admits that it purchased a computer server and various

13 computer systems that were used in ALSF's offices.  ALSF denies the remaining

14 allegations in Paragraph 15 of the Complaint.

15    16.    Defendants admit that the NASDRive was physically connected to

16 ALSF's office server, but are without sufficient information or knowledge to either admit

17 or deny the remaining allegations contained in Paragraph 16 of the Complaint.  By rule,

18 these allegations stand denied.

19    17.    ALSF admits that Jacqueline Shirif was its Chief Financial Officer

20 and that she was caught conducting non-ALSF work in ALSF's offices using ALSF's

21 computers and resources, without ALSF's consent. ALSF further admits that it discovered

22 numerous UCS-related documents in various locations of the ALSF offices on March 14,

23 2016.  Defendants are without sufficient information or knowledge to either admit or deny

24 the remaining allegations contained in Paragraph 17 of the Complaint.  By rule, these

25 allegations stand denied.

26    18.    Defendants admit that ALSF discovered substantial volumes of mail,

27 financial records, and other documents appearing to relate to John Leonesio, his family

28 trust and his other businesses and investments, including but not limited to UCS and

1   Redline, which records had been stored in various locations around ALSF's offices,

2   including in the office of ALSF's Chief Financial Officer and other storage cabinets

3   situated in Suite 100 and on ALSF-owned computer systems. Defendants are without

4   sufficient information or knowledge to either admit or deny the remaining allegations

5   contained in Paragraph 18 of the Complaint.  By rule, these allegations stand denied.

6          19.    ALSF admits that at all times in 2016 through March 14, 2016, Ms.

7   Shirif was employed as ALSF's Chief Financial Officer and worked in an ALSF office in

8   Suite 100 and used an ALSF-owned computer system. Defendants are without sufficient

9   information or knowledge to either admit or deny the remaining allegations contained in

10  Paragraph 19 of the Complaint.  By rule, these allegations stand denied.

11          **Business Operations in Suites 100 and 115 after May 2015**

12          20.    ALSF admits that Ron Record, without consent from ALSF,

13  fraudulently misrepresented himself as a "Member" of ALSF and entered into a written

14  lease dated May 15, 2015, for Suites 100 and 115 at E. Bahia Drive, Scottsdale, Arizona

15  (the "Premises"). Contemporaneously, Ron Record (acting as "CFO" of Redline) executed

16  a written addendum with the Premises' landlord that officially terminated Redline's

17  leasehold rights at the Premises.  Defendants deny the remaining allegations in Paragraph

18  20 of the Complaint.

19          21.    ALSF denies that anyone with proper authority to act on behalf of

20  ALSF ever entered into a Sub-Lease with Redline for any portion of the ALSF office

21  Premises or that Ron Record ever informed ALSF of the terms of any such purported Sub-

22  Lease. ALSF admits that its accounting records show receipt of payments from Redline

23  from about May 2015 through March 2016, which payments were received and processed

24  under the supervision of Ron Record, the CFO of Redline during the same time period in

25  which he was fraudulently misrepresenting himself as a "Member" of ALSF. Defendants

26  deny the remaining allegations in Paragraph 21 of the Complaint.

27          22.    ALSF denies that Redline ever had a contractual right of possession

28  of the Premises or that Redline ever had the consent from ALSF or the building's landlord

1    to enter into the purported Sublease or Second Sub-Lease of ALSF's offices as required
2    under the written lease dated May 15, 2015 (which had been fraudulently signed by Ron
3    Record as a "Member" of ALSF and without ALSF's consent).  Defendants are without
4    sufficient information or knowledge to either admit or deny the remaining allegations
5    contained in Paragraph 22 of the Complaint.  By rule, these allegations stand denied.

6              23.    ALSF denies that a Second Sub-Lease was ever authorized by ALSF
7    or the building's landlord or that Redline had authority to create such an agreement with
8    regard to TLG's alleged right of possession of ALSF's office Premises. Defendants are
9    without sufficient information or knowledge to either admit or deny the remaining
10   allegations contained in Paragraph 23 of the Complaint.  By rule, these allegations stand
11   denied.

12             24.    ALSF denies that a Second Sub-Lease was ever authorized by ALSF
13   or that Redline had authority to create such an agreement with regard to TLG's alleged
14   right of possession of ALSF's office Premises. Defendants are without sufficient
15   information or knowledge to either admit or deny the remaining allegations contained in
16   Paragraph 24 of the Complaint.  By rule, these allegations stand denied.

17             25.    ALSF denies that it "executed the new lease" dated May 15, 2015,
18   because such lease was actually executed by Ron Record fraudulently and without consent
19   when he misrepresented himself as a "Member" of ALSF and knew that he lacked proper
20   authority to bind ALSF to such lease obligations. ALSF admits that Ms. Shirif and other
21   ALSF employees (and ALSF's consultants such as Ron Record) occupied ALSF's office
22   Premises and used computers owned by ALSF.    Defendants are without sufficient
23   information or knowledge to either admit or deny the remaining allegations contained in
24   Paragraph 25 of the Complaint.  By rule, these allegations stand denied.

25             26.    ALSF admits that as of March 14, 2016, its Information Technology
26   equipment, including the ALSF server and the connected NASDrive that contained
27   ALSF's data and information, was physically located inside ALSF's office Premises in
28   Suite 100.  Defendants are without sufficient information or knowledge to either admit or

1    deny the remaining allegations contained in Paragraph 26 of the Complaint.  By rule,

2    these allegations stand denied.

3              27.    ALSF admits that as of March 14, 2016, all computers in Suites 100

4    and 115 connected to a shared computer network owned by ALSF and that users of such

5    computers could access the Internet, send documents to printers, and access documents

6    stored on the NASDrive. Defendants deny the remaining allegations in Paragraph 27 of

7    the Complaint.

8              28.    ALSF denies that Ron Record was ever a manager of ALSF or had

9    any management responsibilities, but admits he is the President of TLG and CFO of

10   Redline. ALSF admits that Mr. Record was granted permission to use an office within

11   ALSF's premises in connection with his franchise consulting services to ALSF. However,

12   ALSF denies that Mr. Record "exclusively used a personal laptop that did not belong to

13   ALSF or Redline" in his office because, in fact, ALSF had purchased and installed a

14   computer in his office specifically to ensure that his work for ALSF was kept secure and

15   separate from any other personal or business work performed by Mr. Record.  ALSF

16   further admits that on March 14, 2016, after Mr. Record had vacated the premises, its

17   agents discovered that Mr. Record was apparently using two separate computers at his

18   desk inside ALSF's offices and that both computers were connected to the shared ALSF

19   computer network and that Mr. Record used such network to transmit data to/from the

20   computers in his office. Defendants deny the remaining allegations in Paragraph 28 of the

21   Complaint.

22              **The Events of March 14, 2016**

23              29.    Defendants admit that on the morning of March 14, 2016, ALSF's

24   representatives and legal counsel, accompanied by duly licensed and uniformed peace

25   officers from the Maricopa County Sheriff's Office, arrived at ALSF's Premises to hand-

26   deliver to Ron Record a written notice of rescission (or on the alternative, termination) of

27   the JV Agreement between ALSF and Record/TLG, and to provide notices of termination

28   to several employees of ALSF. Upon delivering such notices, Defendants admit that

ALSF's representatives and legal counsel instructed Ron Record and ALSF's terminated employees, including Ms. Shirif, to leave ALSF's Premises without removing any items or personal property from ALSF's offices—with the exception of keys and personal cell phones. Defendants admit that ALSF's attorney/agent, Grant Walsh, and another ALSF representative named Diego were among the ALSF agents who were present for these events. Defendants deny the remaining allegations in Paragraph 29 of the Complaint.

30.   Defendants admit that ALSF's agents asked all non-ALSF personnel to leave ALSF's Premises and that the duly licensed peace officers were in the proximity of the ALSF offices to secure and protect ALSF's property. Defendants deny the remaining allegations in Paragraph 30 of the Complaint.

31.   Defendants deny that Mr. Record was working in his office in Suite 100 when he was given the rescission (or alternatively, termination) notice of the JV Agreement because such notice was delivered to him in the main conference room of Suite 100. Defendants admits that after notice of termination was delivered to Mr. Record in the conference room, he demanded to return to his office to gather his personal belongings and was informed he would be permitted to do so for the sole purpose of retrieving his keys and personal cell phone. Defendants admit that ALSF's agents (with one of the peace officers following behind them to observe) accompanied Mr. Record back to his office in Suite 100 where Mr. Record began aggressively grabbing paper files and folders from his desk and tried to place them into his briefcase/computer bag. Defendants admit Mr. Record then tried to start doing something on one of the two computers at his desk. Defendants admit that ALSF's agents instructed Mr. Record to put down all papers and files he was trying to remove from ALSF's offices and to step away from the computers on his desk. Defendants deny the remaining allegations in Paragraph 31 of the Complaint.

32.   Defendants deny that ALSF's attorney/agent, Grant Walsh, acted forcibly or aggressively toward Mr. Record. Defendants further deny that Mr. Walsh ever had any physical contact with Mr. Record or took any action that threatened Mr. Record

with physical harm.  Defendants deny the remaining allegations in Paragraph 32 of the Complaint.

33.     ALSF admits that its agents asked questions to Ryan Cole, who was acting as ALSF's Chief Information Officer until he was terminated on that date, regarding his knowledge of ALSF's computer systems, electronic data, and access/passwords needed for the systems. Defendants deny the remaining allegations in Paragraph 33 of the Complaint.

34.     Defendants deny the allegations in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations in Paragraph 35 of the Complaint.

36.     Defendants deny the allegations in Paragraph 36 of the Complaint.

37.     ALSF admits that after Mr. Cole provided information concerning the computer network in ALSF's offices, Mr. Cole was requested to depart the Premises and to not remove anything other than his keys and personal cellphone from ALSF's offices. Defendants deny the remaining allegations in Paragraph 37 of the Complaint.

38.     ALSF admits that Mr. Cole returned to ALSF's Premises the following day and was allowed to retrieve his personal belongings. ALSF admits that a professional document imaging company was engaged by ALSF to make copies and to preserve an evidentiary record of the papers and files that were discovered on March 14, 2016 in the ALSF offices previously used by Ron Record, Ms. Shirif and Mr. Cole. Defendants deny the remaining allegations in Paragraph 38 of the Complaint.

39.     ALSF admits that it permitted Ron Record to retrieve a laptop computer at the ALSF offices approximately 48 hours after Mr. Record was instructed to leave ALSF's Premises. ALSF admits that prior to returning the computer to Mr. Record, ALSF's agents conducted a review of the data and files on the computer to remove and retain all electronic records and communications that were identified as pertaining to ALSF's business, finances and operations—in accordance with ALSF's sole right of possession to such information under the written JV Agreement between ALSF and

1    Record/TLG. Defendants deny the remaining allegations in Paragraph 39 of the
2    Complaint.

3          40.    Defendants deny the allegations in Paragraph 40 of the Complaint.

4          41.    Defendants admit that the Internet browser software such as Google
5    Chrome or Internet Explorer on one or both of the networked computers situated at Mr.
6    Record's old desk was used by one or more of ALSF's agents for various web-browsing
7    or research purposes, including a search for a local professional document imaging
8    company in the Scottsdale area who could come to the ALSF offices to make and preserve
9    digital image copies of the paper files and documents that had been discovered in certain
10   parts of ALSF's offices on March 14, 2016. Defendants deny the remaining allegations in
11   Paragraph 41 of the Complaint.

12         42.    ALSF admits that it engaged a professional document imaging
13   service to preserve and document a copy of the evidentiary record of the paper files—in
14   the same manner and system of organization in which they were found—discovered in the
15   ALSF offices previously occupied by Ron Record, Ms. Shirif and Mr. Cole. Defendants
16   deny the remaining allegations in Paragraph 42 of the Complaint.

17         43.    ALSF admits that it engaged a professional document imaging
18   service to preserve and document an evidentiary record of the paper files—in the same
19   manner and system of organization in which they were found—discovered in the ALSF
20   offices previously occupied by Ron Record, Ms. Shirif and Mr. Cole.  Defendants deny
21   the remaining allegations in Paragraph 43 of the Complaint.

22         44.    Defendants deny the allegations in Paragraph 44 of the Complaint.

23                        **FIRST CLAIM FOR RELIEF**
24                (Alleged Breach of Contract - Redline against ALSF)

25         45.    ALSF incorporates each of the preceding Paragraphs.

26         46.    ALSF denies the allegations in Paragraph 46 of the Complaint.

27         47.    ALSF denies the allegations in Paragraph 47 of the Complaint.

28

1

2

## SECOND CLAIM FOR RELIEF
### (Alleged Breach of Covenant of Good Faith and Fair Dealing - Redline against ALSF)

3          48.    ALSF incorporates each of the preceding Paragraphs.

4          49.    ALSF denies the allegations in Paragraph 49 of the Complaint.

5          50.    ALSF denies the allegations in Paragraph 50 of the Complaint.

6          51.    ALSF denies the allegations in Paragraph 51 of the Complaint.

7

## THIRD CLAIM FOR RELIEF
### (Alleged Wrongful Eviction - Redline against ALSF)

8

9          52.    ALSF incorporates each of the preceding Paragraphs.

10         53.    ALSF denies the allegations in Paragraph 53 of the Complaint.

11         54.    ALSF denies the allegations in Paragraph 54 of the Complaint.

12         55.    ALSF denies the allegations in Paragraph 55 of the Complaint.

13

14

## FOURTH CLAIM FOR RELIEF
### (Alleged Conversion - Redline against ALSF)

15

16         56.    ALSF incorporates each of the preceding Paragraphs.

17         57.    ALSF denies the allegations in Paragraph 57 of the Complaint.

18         58.    ALSF denies the allegations in Paragraph 58 of the Complaint.

19         59.    ALSF denies the allegations in Paragraph 59 of the Complaint.

20

## FIFTH CLAIM FOR RELIEF
### (Alleged Conversion - TLG against ALSF)

21

22         60.    ALSF incorporates each of the preceding Paragraphs.

23         61.    ALSF denies the allegations in Paragraph 61 of the Complaint.

24         62.    ALSF denies the allegations in Paragraph 62 of the Complaint.

25         63.    ALSF denies the allegations in Paragraph 63 of the Complaint.

26

## SIXTH CLAIM FOR RELIEF
### (Alleged Conversion - UCS against ALSF)

27

28

{00132220-1 }        5185819.1                    11

64.     ALSF incorporates each of the preceding Paragraphs.

65.     ALSF denies the allegations in Paragraph 65 of the Complaint.

66.     ALSF denies the allegations in Paragraph 66 of the Complaint.

67.     ALSF denies the allegations in Paragraph 67 of the Complaint.

**SEVENTH CLAIM FOR RELIEF**
(Alleged Conversion - Mr. Leonesio against ALSF)

68.     ALSF incorporates each of the preceding Paragraphs.

69.     ALSF denies the allegations in Paragraph 69 of the Complaint.

70.     ALSF denies the allegations in Paragraph 70 of the Complaint.

71.     ALSF denies the allegations in Paragraph 71 of the Complaint.

**EIGHTH CLAIM FOR RELIEF**
(Alleged Conversion - Mr. Record against ALSF)

72.     ALSF incorporates each of the preceding Paragraphs.

73.     ALSF denies the allegations in Paragraph 73 of the Complaint.

74.     ALSF denies the allegations in Paragraph 74 of the Complaint.

75.     ALSF denies the allegations in Paragraph 75 of the Complaint.

**NINTH CLAIM FOR RELIEF**
(Alleged Intentional Interference with Contract - TLG against ALSF)

76.     ALSF incorporates each of the preceding Paragraphs.

77.     ALSF denies the allegations in Paragraph 77 of the Complaint.

78.     ALSF denies the allegations in Paragraph 78 of the Complaint.

79.     ALSF denies the allegations in Paragraph 79 of the Complaint.

80.     ALSF denies the allegations in Paragraph 80 of the Complaint.

**TENTH CLAIM FOR RELIEF**
(Alleged Violation of Computer Fraud and Abuse Act - 18 U.S.C. §§103(g);
1030(a)(2)(C); 1030(a)(5)(C) - Redline and Mr. Record against Defendants)

81.     Defendants incorporate each of the preceding Paragraphs.

82.   Defendants deny the allegations in Paragraph 82 of the Complaint.

83.   Defendants deny the allegations in Paragraph 83 of the Complaint.

84.   Defendants deny the allegations in Paragraph 84 of the Complaint.

85.   Defendants deny the allegations in Paragraph 85 of the Complaint.

86.   Defendants deny the allegations in Paragraph 86 of the Complaint.

87.   Defendants deny the allegations in Paragraph 87 of the Complaint.

88.   Defendants deny the allegations in Paragraph 88 of the Complaint.

89.   Defendants deny the allegations in Paragraph 89 of the Complaint.

90.   Defendants deny the allegations in Paragraph 90 of the Complaint.

## ELEVENTH CLAIM FOR RELIEF
(Alleged Violation of the Stored Communications Act - 18 U.S.C. §§2707 - Redline and Mr. Record against Defendants)

91.   Defendants incorporate each of the preceding Paragraphs.

92.   Defendants deny the allegations in Paragraph 92 of the Complaint.

93.   Defendants deny the allegations in Paragraph 93 of the Complaint.

94.   Defendants deny the allegations in Paragraph 94 of the Complaint.

95.   Defendants deny the allegations in Paragraph 95 of the Complaint.

96.   Defendants deny the allegations in Paragraph 96 of the Complaint.

97.   Defendants deny the allegations in Paragraph 97 of the Complaint.

## TWELFTH CLAIM FOR RELIEF
(Alleged Battery - Ron Record against Grant Walsh)

98.   Mr. Walsh incorporates each of the preceding Paragraphs.

99.   Mr. Walsh denies the allegations in Paragraph 99 of the Complaint.

100.   Mr. Walsh denies the allegations in Paragraph 100 of the Complaint.

## THIRTEENTH CLAIM FOR RELIEF
(Alleged Assault - Ron Record against Grant Walsh)

{00132220-1 }        5185819.1                    13

101.   Mr. Walsh incorporates each of the preceding Paragraphs.

102.   Mr. Walsh denies the allegations in Paragraph 102 of the Complaint.

103.   Mr. Walsh denies the allegations in Paragraph 103 of the Complaint.

## II.    DEFENDANTS' AFFIRMATIVE DEFENSES

Answering further, if necessary, Defendants are not liable to Plaintiffs because—

1.    Plaintiffs' claims are barred because Defendants' actions were reasonable and necessary steps to protect ALSF's own legal rights, including ALSF's contractual rights under the JV Agreement and its right to possession of the Premises and other intangible business interests.

2.    Plaintiffs' claims are barred because Defendants' actions were privileged because they were taken in a good faith effort to protect ALSF's own legal rights, including ALSF's contractual rights under the JV Agreement and its right to possession of the Premises and other intangible business interests.

3.    Plaintiffs' claims are barred against ALSF's attorney, Grant Walsh, because Mr. Walsh's actions are subject to attorney privilege in that he was acting reasonably and in good faith as an officer of the court during the course and scope of his legal counsel and representation of ALSF in order to preserve evidence and to protect ALSF's legal rights, including ALSF's contractual rights under the JV Agreement and its right to possession of the Premises and other intangible business interests.

4.    Plaintiffs' claims for conversion are barred based on the JV Agreement between ALSF and "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates."

5.    Plaintiffs' claim for intentional interference with contract is barred based on the JV Agreement between ALSF and "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates."

6.      Plaintiffs' claim for violations of the Computer Fraud and Abuse Act is barred based on agreements between ALSF and "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates."

7.      Plaintiffs' claim for violations of the Computer Fraud and Abuse Act are barred due to intervening and supervening causation.

8.      Plaintiffs' claim for violations of the Stored Communications Act is barred based on agreements between ALSF and "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates."

9.      Plaintiffs' claim for violations of the Stored Communications Act is barred due to intervening and supervening causation.

10.     Plaintiffs' claims are barred by their prior material breach of the agreements between ALSF and "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates."

11.     Plaintiffs' claim for breach of contract is barred by lack of capacity because Ron Record purported to enter into a lease, sub-lease and second sub-lease for the Premises by knowingly, intentionally and fraudulently misrepresenting himself as a "Member" of ALSF.

12.     Plaintiffs' claims are barred by fraud or conspiracy to commit fraud.

13.     Plaintiffs' claims are barred under the doctrine of fraudulent inducement.

14.     Plaintiffs' claims are barred by illegality.

15.     Plaintiffs' claims are barred by the doctrine of unclean hands.

16.     Plaintiffs' claims are barred by estoppel and other equitable doctrines.

17.     Plaintiffs' claims are barred by express contract.

18.     Plaintiffs' claims are barred by legal justification.

19.     Plaintiffs' claims are barred in whole or in part, or their recoverable damages should be reduced, because they failed to take reasonable steps to minimize or mitigate damages.

20.     If Plaintiffs were damaged as alleged, which is not admitted, such damages resulted in whole or in part from Plaintiffs' own actions or third party actions for which Defendants are not responsible.

21.     Plaintiffs' claim for breach of contract is barred by the statute of frauds.

22.     Plaintiffs' claims about Defendants' access to computers, as alleged, fail because Defendants' access was authorized under the terms of the JV Agreement by and between ALSF and "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates."

## III.   COUNTERCLAIM

### AMAZING LASH STUDIO FRANCHISE, LLC'S FIRST AMENDED COUNTERCLAIM AGAINST REDLINE ATHLETICS FRANCHISING, LLC

Amazing Lash Studio Franchise, LLC ("ALSF") brings this Counterclaim under Federal Rule of Civil Procedure 13(a) for damages and offset because of the unlawful actions of Redline Athletics Franchising, LLC ("Redline") and respectfully shows the Court as follows:

### Parties

1.     Counter-Plaintiff ALSF is a Texas limited liability company that conducts business in this judicial district.

2.     Counter-Defendant Redline is a limited liability company, organized under the laws of the State of Arizona, with its principal place of business in this judicial district.

1        3.      The Court has diversity jurisdiction over this counterclaim action

2    under 28 U.S.C. § 1332. Additionally, this Court has federal question jurisdiction under

3    28 U.S.C. §§ 1331, 1441(a) because Redline has asserted causes of action in the

4    underlying suit arising under two federal statutes—the Computer Fraud & Abuse Act, 18

5    U.S.C. §§ 1030(g); 1030(a)(2)(C); and 1030(a)(5)(C), and the Stored Communications

6    Act, 18 U.S.C. §§ 2707; 2701.Venue is proper in this district under 28 U.S.C. § 1391(c)

7    because the events giving rise to this counterclaim occurred in this district.

8        4.      ALSF is a franchised business system in the beauty industry that was

9    founded by Jessica and Edward Le. ALSF uses an operating system and trademarks

10   developed and owned by ALSF or its affiliates to offer eyelash extension services.

11       5.      Redline operates a franchised sports training business system that

12   uses the operating system and trademarks developed and owned by it or its affiliates.

13   During the events giving rise to this action, John Leonesio served as the CEO of Redline,

14   and Ron Record served as its CFO.

15       6.      Redline is owned by United Club Services, LLC ("UCS"), the

16   personal investment holding company, of which John Leonesio is the only member. Ron

17   Record is the General Manager of UCS, and John Leonesio is the UCS's Chairman and

18   sole member.

19       7.      Upon information and belief, it was UCS's intent to sell its

20   ownership interest in Redline by the end of 2016 to The Leonesio Group, LLC ("TLG").

21   TLG represents itself as an experienced franchise consulting group operated by John

22   Leonesio as Chairman and Ron Record as President and Managing Member.

23       8.      Redline, UCS and TLG are affiliated entities based on the common

24   control and ownership among each of them by John Leonesio and Ron Record.

25       9.      ALSF had no interactions or relationship with Redline until ALSF

26   entered into a business relationship with TLG. In fact, prior to ALSF's business

27   relationship with TLG as described below, ALSF had no nexus at all with TLG's affiliate,

28   Redline.

{00132220-1 }        5185819.1                           17

**Joint Venture Agreement between ALSF and TLG**

10.     On or about June 1, 2014, ALSF entered into a franchise consulting agreement known as the Amazing Lash Studio Joint Venture Agreement (the "JV Agreement") with TLG.  Under the JV Agreement, TLG was engaged to assist ALSF in all aspects of establishing, developing, and implementing its franchise program and assisting with the offer and sale of franchises.  Because ALSF knew that TLG and its leadership team of John Leonesio and Ron Record were affiliated with other franchise concepts—including Redline—ALSF and TLG negotiated for the JV Agreement to contain strong protections against the use or disclosure of ALSF's business information to TLG's other affiliated businesses.

11.     Under Section 1.5 of the JV Agreement, the covenant of confidentiality, TLG was required (a) to have each of its employees, agents and affiliates sign a written confidentiality agreement prior to disclosing any ALSF-related confidential information to such persons; and (b) not to permit the use of any ALSF-related confidential information in any other business or capacity other than TLG's performance of its obligations under the JV Agreement.

12.     When TLG entered into the JV Agreement, it expressly affirmed that the covenants of confidentiality would apply to "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates" and that these covenants "shall be perpetually binding upon TLG and each of its employees, agents and affiliates."

13.     Indeed, the JV Agreement provides: "TLG, on behalf of itself and its owners, officers, agents, employees and affiliates, shall at all times maintain the confidentiality of all Confidential Information concerning ALS or any aspect of its business or the Salons." The covenant of confidentiality further provides that "the use or duplication of any Confidential Information in connection with any other business would constitute an unfair method of competition and a material breach of this Agreement."

14.     As an affiliate of TLG that was similarly controlled by John Leonesio and Ron Record, Redline was knowingly subject to the covenant of confidentiality with

1   ALSF as set forth in the JV Agreement. After all, the JV Agreement had been signed by

2   Redline's own CFO, Ron Record.

3           15.     Under the terms of the JV Agreement, John Leonesio became CEO

4   of ALSF. Simultaneously, John Leonesio was also serving as CEO of Redline.

5   <u>**Redline's Improper Access and Use of ALSF's Business Information**</u>

6           16.     As an affiliate of TLG, and unbeknownst to ALSF, Redline and its

7   personnel failed to sign a confidentiality agreement to ALSF as required under the JV

8   Agreement prior to Redline's exposure to ALSF-related confidential information.

9   Moreover, TLG, Record and Leonesio allowed their affiliate Redline to combine, co-

10  mingle and/or jointly use and disclose ALSF's confidential information (including but not

11  limited to franchisee prospects and sales leads, marketing materials, financial accounting

12  records, IT/technology, HR/personnel records, and operations manuals) for the benefit of

13  Redline and TLG's other businesses.

14  <u>**Redline's Scheme to Unlawfully Misappropriate of ALSF's Resources**</u>

15          17.     Shortly after TLG entered into the JV Agreement with ALSF in June

16  2014, TLG's affiliate, Redline, started facing difficult financial circumstances. Redline's

17  cash flow was drying up, and the company was struggling to meet its financial obligations

18  without additional capital infusions from John Leonesio and/or his company, UCS.

19          18.     In early September 2014, Ron Record was acting concurrently as

20  Redline's CFO and also as the President of TLG, which was supposed to be providing

21  business and franchise consulting counsel to ALSF under the JV Agreement. Mr. Record,

22  as CFO, and Mr. Leonesio, as CEO, were acutely aware of Redline's dire financial

23  circumstances. As a joint-venturer with ALSF, TLG and its officers Record and Leonesio,

24  owed a fiduciary duty to ALSF.

25          19.     On Friday, September 5, 2014 Ron Record reached out by telephone

26  to Edward Le, President of ALSF, to make a proposal for ALSF to hire some of Redline's

27  employees on a contract basis in order for them to provide some services to ALSF. By

28

{00132220-1 }     5185819.1          19

1   follow-up email dated September 9, 2014, Edward Le responded to Mr. Record and
2   suggested that he discuss this proposal with John Leonesio.

3       20.    On September 10, 2014, Ron Record sent an email to Mr. Le
4   suggesting that the employee-sharing arrangement would include three specific people
5   that "would be on both the ALSF and Redline payrolls"—Ryan Cole (who is also John
6   Leonesio's nephew), Andy Nasseef, and Tamera Norwood. Further, Mr. Record wrote:
7   "Every two weeks the workload would be reconciled and the payroll costs would be
8   charged to the respective companies." Record wrote that the arrangement would be in
9   place "through the rest of the year." Mr. Le responded by email that same day and  agreed
10  with Mr. Record's proposal.

11      21.    Redline failed to conduct the accounting reconciliation every two
12  weeks as it had promised and upon information and belief, ALSF overpaid during this
13  period to the benefit of Redline and detriment of ALSF. The parties did not create an
14  agreement to extend the employee-sharing arrangement following the end of 2014, nor did
15  they agree to expand the arrangement to include other specifically-named employees.
16  Upon information and belief, the real motivation behind the Redline CFO's "employee-
17  sharing" proposal to ALSF was that Redline was unable to continue meeting its payroll
18  obligations. As such, while ALSF may have gained some modest benefit from the
19  arrangement, the primary beneficiary of the deal was Redline.

20      22.    Redline (under the direction of Record and Leonesio) used TLG (also
21  under the direction of Record and Leonesio) to take financial advantage of TLG's
22  relationship with ALSF for the financial gain of Redline. Redline repeatedly used and
23  manipulated TLG's relationship with ALSF to cause ALSF to be billed fraudulently for
24  goods, services and opportunities that were, in fact, benefitting Redline. ALSF's financial
25  investigation remains ongoing, but the following are some examples of Redline's financial
26  misconduct, fraud, and conspiracy to commit fraud in concert with TLG, that have been
27  discovered to date.

28      **A. Nondisclosure of Financial Arrangement with Caliber Commercial Group**

23.     In October 2014, John Leonesio and Ron Record were working to find a "Director or Real Estate" for both ALSF and Redline, and entered into negotiations with Caliber Commercial Group ("Caliber"), a real estate brokerage firm recommended by John Leonesio. On November 3, 2014, Caliber's Executive Vice President, Lance Weurding, submitted an email proposal to Record for Caliber to provide such real estate services to both ALSF *and* Redline for a base retainer fee of $5,000 per month.

24.     Without obtaining final approval or consent from ALSF, on November 18, 2014, Ron Record falsely represented himself as a "Manager" of ALSF when he entered into an agreement with Caliber called the "Amazing Lash Studio Real Estate Services Agreement," which obligated ALSF to pay the entire monthly retainer fee of $5,000 per month—with no mention that Redline would be responsible for any portion of the monthly fees. Redline, acting by and through its CFO Ron Record (who also had a concurring fiduciary duty to ALSF in his role as President of TLG), intentionally and fraudulently manipulated the arrangement with Caliber so that Redline would receive direct benefits and services from Caliber (and its principals, Lance Weurding and Troy Weurding)—while ensuring that Caliber's entire $5,000 monthly fee would be charged solely to ALSF. This fraudulent scheme was orchestrated by Redline to gain benefits from Caliber at ALSF's expense from December 2014 through March 2016.

**B. Fraudulent Use of ALSF's Personnel, Resources and Business Information**

25.     Throughout 2015, Redline's CFO, Ron Record, was ordering employees of ALSF to provide services for the benefit of Redline during business hours in which they were on ALSF's payroll. ALSF's employees cooperated with Mr. Record's requests because he was simultaneously representing himself to them as the President of TLG (i.e., ALSF's franchise consulting firm) and also misrepresenting himself to be a manager and member of ALSF. For example, Mr. Record repeatedly instructed Megan Pirie, an administrative assistant on ALSF's payroll, to assist him with the development and editing of marketing and financial materials for use by Redline. Similarly, Mr. Record

1   was using other ALSF employees such as Jackie Shirif, its CFO, to conduct bookkeeping
2   and financial services for the benefit of Redline.

3            26.     In or about June 2015, Ron Record and/or John Leonesio were
4   involved with instructing an ALSF employee to deliver a mailing list of prospective
5   franchisee customers to Redline's corporate controller, Kate Bystrom. This action was
6   consistent with Ron Record's pattern of behavior because he similarly instructed an ALSF
7   employee to deliver a list of franchise sales prospects that was used by ALSF to TLG's
8   other client, Hammer & Nails Salon.

9        **C. Conspiracy to Commit Fraud with TLG for Costs of Franchising Conference**

10           27.     In January 2016, Redline conspired with TLG to fraudulently
11   misappropriate ALSF's funds to pay thousands of dollars for Redline to enjoy a three day
12   tradeshow conference at Caesars Palace in Las Vegas, Nevada. Specifically, Redline and
13   TLG conspired for Ron Record to use his credit card to pay for a "Silver standard
14   sponsorship at the 2016 Multi-Unit Franchising Conference (April 27-29, 2016 at Caesars
15   Palace Las Vegas) for RedLine Athletics." Thereafter, Redline's CFO Ron Record used
16   his concurrent position as President of TLG to invoice 70% of such expense to ALSF
17   (along with 30% of the charge being invoiced to one of TLG's other client, The Hammer
18   & Nails Salon Group, LLC).

19        **D. Insurance Fraud for the Financial Benefit of Redline**

20           28.     Redline's CFO Ron Record and his family were insured under
21   Redline's group health insurance plan in 2014 and through the first half of 2015.
22   However, on June 17, 2015, Record executed falsified insurance certifications and
23   applications in which he claimed to be an employee of ALSF for the purpose of enrolling
24   himself, his wife, his daughter and his two sons in ALSF's company-paid employee health
25   insurance program. Record was never an employee of ALSF. By and through the
26   knowingly fraudulent actions of its CFO, Redline effectively moved Record and his
27   family's personal healthcare expense—more than $16,000 per year—off the books of
28   Redline and onto the books of ALSF. Such fraudulent activity is a continuation of the

pattern of fraud by Redline (acting under the control and direction of Record and Leonesio) for its own financial gain and to the detriment of ALSF.

29.     ALSF's investigation remains ongoing and the above examples are not intended to be a full and complete list of Redline's misconduct giving rise to this counterclaim.

### The Office Lease for 9383 E. Bahia, Suites 100 and 115

30.     Upon information and belief, on or about December 1, 2013, Redline entered into a written lease agreement for Suite 115 at 9383 E. Bahia Drive in Scottsdale, Arizona ("Suite 115").

31.     By late 2014 and into 2015, Redline was continuing to face financial struggles. During that period, ALSF had several employees who were office-sharing with Redline, so ALSF was making payments to Redline to help offset some of the office expenses and overhead in exchange for this informal arrangement.

32.     In February 2015, Ron Record (appearing to act in his capacity as President of TLG/consultant to ALSF) advised ALSF that it would be prudent to relocate most of its operations from Houston to Scottsdale. Thus Mr. Record suggested it was appropriate for ALSF to start looking for larger office space in Scottsdale to support ALSF's growing operations.

33.     In response, on March 2, 2015, ALSF's President, Edward Le, asked for Mr. Record to provide specific details and to answer questions about a future office-sharing with Redline, the size of space that was needed, and the location of the proposed office. Notably, Mr. Le specifically asked of Mr. Record: "Can I have a complete proposal of the headquarters?"

34.     Mr. Record responded by email on March 5, writing: "Great questions; and of course, we will answer all of them after we have information to report…" Despite ALSF's requests, Mr. Record and Redline never provided ALSF with a written proposal or even a summary of the terms for any proposed office spaces in Scottsdale. Nevertheless, Ron Record, now acting as Redline's CFO, took matters into his

own hands to once again manipulate ALSF as a financial slush fund for the benefit of Redline and TLG. Indeed, knowing Redline was in a financial hole, Record concocted a scheme by which he could ensure that Redline was released from the financial burdens of its long-term lease for Suite 115 and that such liability would be shifted over to ALSF.

35.     Without ever having provided ALSF with a copy of the proposed lease to obtain proper consent and approval, on or about May 15, 2015, Ron Record fraudulently represented himself as "Member" of ALSF and executed a lease for ALSF to take over full contractual liability for Redline's tenancy for Suite 115, and to also take on tenant obligations for Suite 100 at the same address. Contemporaneously, the landlord and Ron Record (signing this time as "CFO" of Redline) executed Addendum # 2 to the lease, in which Redline's tenancy and lease obligations were terminated without penalty to Redline. Despite knowing that ALSF had expressly asked for material information about the proposed lease and how any office-sharing arrangement between Redline and ALSF might be structured, Redline (by and through its CFO Ron Record) intentionally and fraudulently failed to disclose any details to ALSF—including the fact that the new lease of May 15, 2015 was designed to remove all tenant liability for Redline and shift such liability to ALSF. Redline knew that ALSF would likely object to assuming all of Redline's tenant liabilities for the offices being used by Redline.

36.     The new lease fraudulently executed by Ron Record as "Member" of ALSF expressly prohibited subleases or assignments of ALSF's tenancy rights. Nevertheless, at some point soon thereafter, Ron Record once again acted fraudulently and without authorization from ALSF or the building's landlord, purportedly entered into an oral sublease agreement on behalf of ALSF and for the benefit of Redline, as sub-tenant.

37.     Upon information and belief, Ron Record was the only person involved in this purported oral sublease because he never provided information about the proposed terms or sought consent from anyone at ALSF concerning the sublease. Indeed, ALSF was not even aware of the purported sublease until Redline commenced this lawsuit

1  on March 15, 2016 and filed claims alleging ALSF had breached such oral agreement that

2  was made between Ron Record, as an alleged "Member" of ALSF, with Ron Record, as

3  CFO of Redline. Upon information and belief, such arrangement was struck by a

4  handshake deal between Ron Record's own right hand and left hand without consent of

5  ALSF.

6        38.    Next, Redline (by and through its CFO Ron Record), continued to

7  commit even further misconduct when it purportedly entered into an oral sub-sublease to

8  lease part of ALSF's offices to TLG. Once again, it appears that Ron Record was the only

9  person involved in this purported oral sub-sublease because he never provided

10  information about the proposed terms or sought consent from anyone at ALSF or the

11  building's management company concerning the sub-sublease now claimed between

12  Redline and TLG. ALSF had no knowledge of the purported sublease until Redline

13  commenced this lawsuit on March 15, 2016 and claimed the existence of such oral

14  agreement. Upon information and belief, such sub-sublease arrangement was also struck

15  by a handshake deal between Ron Record's own right hand and left hand without consent

16  of ALSF.

17        39.    At no time did ALSF authorize Ron Record to act on its behalf in

18  connection with executing any legally-binding contracts. In fact, under the JV Agreement

19  signed between Ron Record and ALSF, it states: "Neither TLG nor ALS shall have the

20  authority to act for the other in any manner to create any obligations or liabilities or incur

21  any debts or expenses binding on the other." Nevertheless, Record used his position as

22  President of TLG and franchising consultant for ALSF to manipulate funds and to feign

23  his authority to take actions on behalf of ALSF for the benefit of his other company,

24  Redline.

25        40.    After ALSF learned that a new lease had apparently been executed

26  for ALSF's offices in Scottsdale in mid-2015, ALSF repeatedly asked TLG and Record to

27  provide a copy of such lease for review and filing. This was important because Edward Le

28  had contacted Record to inquire about the origin of payments Redline had been making to

ALSF in connection with the offices. TLG and Record refused to provide a copy of the lease to ALSF because they knew it would reveal how Record, as CFO of Redline, had manipulated ALSF's lease situation to benefit Redline. Similarly, at no time did Redline, Record, or TLG communicate to ALSF the terms of any oral sublease or sub-sublease for the ALSF's offices, despite Redline's knowledge that ALSF had expressly requested such material information from Redline's CFO about any proposed office-sharing arrangement between ALSF and Redline.

41.     On or about March 10, 2016, ALSF finally obtained a copy of the lease by circumventing TLG and Record and by contacting the landlord and the accounting firm that TLG had engaged for ALSF.

42.     Upon receipt and review of the lease dated May 15, 2015, ALSF learned that Record has misrepresented himself as "Member" of ALSF. Further, ALSF was able to confirm that it was listed as the sole tenant under the lease and, therefore, ALSF had the sole right of possession for Suites 100 and 115. Further, ALSF noted that in Addendum #2 to the lease, Ron Record, as CFO for Redline, had expressly surrendered Redline's right of possession for the premises when Redline agreed to terminate its original lease.

**The Events of March 14, 2016**

43.     On March 14, 2016, as a result of discovering incurable fraudulent conduct and material breach by TLG, Record and Leonesio, ALSF rescinded (or alternatively, terminated) the JV Agreement.  ALSF also immediately removed Leonesio as CEO due to his role in knowingly and/or negligently allowing some or all of the misconduct by TLG, Record, and other affiliates—including Redline.

44.     Upon rescinding the JV Agreement, ALSF discovered that many of the TLG affiliates, including Redline, were (i) occupying and operating out of ALSF's leased office space (without ALSF's consent and in direct breach of the very same lease Ron Record had entered into as a purported "Member" of ALSF), (ii) improperly accessing ALSF's confidential and proprietary information and trade secrets and

distributing same to third parties, and (iii) unlawfully utilizing money, employees, and other resources of ALSF to support their own businesses—all to the financial and business detriment of ALSF.  ALSF learned that the TLG affiliates, including Redline—at the direction of and based upon their connection to TLG, Leonesio, and Record—knew of and exploited the JV Agreement and improperly benefitted from the relationship through such concerted misconduct.

45.    Upon delivering the notice of rescission/termination to TLG on March 14, 2016, ALSF and its agents acted in good faith and took reasonable and necessary steps to protect ALSF's own legal rights, including ALSF's contractual rights under the JV Agreement and its right to possession of the Premises and other intangible business interests.  Accordingly, ALSF instructed all non-ALSF personnel and businesses—including Redline—to leave ALSF's offices.

46.    In order to protect its confidential business information, ALSF did not permit the removal of any written or electronic records, files, computers or other storage devices from ALSF's offices until ALSF's agents had a reasonable opportunity to inventory and account for ALSF's property. Additionally, in anticipation of litigation based on Ron Record's threat that he would sue everyone involved in ALSF's actions and in order to preserve an evidentiary record of the documents, files and records as they were stored at ALSF's offices on March 14, 2016, ALSF engaged a professional document imaging service to duplicate and preserve a copy of such records.

**Count One:**
**Conspiracy to Induce TLG and Record's Breach of Fiduciary Duty**

47.    The factual allegations of paragraphs 1 through 46 are incorporated by reference.

48.    TLG and Record, as joint venturers with ALSF, owed fiduciary duties to ALSF.  Leonesio, as CEO of ALSF, likewise owed fiduciary duties to ALSF.

49.     Redline, by and through its CFO Ron Record, knowingly acted in concert with TLG, Leonesio, and Record as part of a combination whose purpose was to accomplish an unlawful purpose or a lawful purpose by unlawful means: specifically, to breach their fiduciary duties in order to benefit financially by utilizing ALSF's money, personnel, office space and resources for their own benefit.  Redline had a meeting of the minds on this object or course of action with TLG, Record and Leonesio, committed unlawful, overt acts to further that object or course of action, and proximately caused damage to ALSF.

50.     ALSF is entitled to recover its actual damages as well as exemplary damages because the conduct by Recline was intentional.

**Count Two:**
**Aiding and Abetting TLG and Record's Breach of Fiduciary Duty**

51.     The factual allegations of paragraphs 1 through 46 are incorporated by reference.

52.     Redline knew that TLG and Record, as joint venturers with ALSF, owed fiduciary duties to ALSF.  Redline also knew that Leonesio, as CEO of ALSF, likewise owed fiduciary duties to ALSF. Such fiduciary duties include, but are not limited to, the duty of good faith and fair dealing.

53.     Despite that knowledge, Redline (by and through its CFO Ron Record), knowingly participated in TLG, Leonesio, and Record's breach of fiduciary duty by, among other things, aiding and abetting TLG, Record and Leonesio in manipulating and self-dealing to benefit Redline and TLG's other affiliates and by utilizing ALSF's money, personnel, office space and resources for their own benefit.  Redline had a meeting of the minds on this object or course of action with TLG, Record and Leonesio, committed unlawful, overt acts to further that object or course of action, and proximately caused damage to ALSF.

54.     ALSF is entitled to recover its actual damages as well as exemplary damages because the conduct by Recline was intentional.

**Count Three:**
**Fraud**
**(Intentional Misrepresentations and Nondisclosure of Material Facts)**

55.     The factual allegations of paragraphs 1 through 46 are incorporated by reference.

56.     Redline, by and through its CFO Ron Record, made false representations of material fact, or intentionally failed to disclose material facts to ALSF, with the intent that ALSF rely upon such representations or nondisclosures in deciding ALSF's own course of action in various situations.

57.     Specifically, as described in detail above, Redline's participation and involvement in the Caliber Collision Group arrangement (October 2014 to March 2016), the 2016 Multi-Unit Franchising Conference (January to February 2016), the transfer of Ron Record's family from Redline's insurance to ALSF's insurance (in June 2015), and the new lease arrangement for offices at 9383 E. Bahia Drive in May 2015 that shifted Redline's entire tenant liabilities over to ALSF, were accomplished for the benefit of Redline through false representations or intentional nondisclosure to ALSF of material facts on which Redline knew ALSF was relying or that Redline knew would alter ALSF's actions if ALSF had known the truth of the situations. Additionally, Redline intentionally failed to disclose to ALSF material facts about Redline's purported oral sublease and sub-sublease affecting ALSF's offices that were allegedly created at some point between May 2015 and March 2016.

58.     Redline knew its representations made via its agent/CFO Ron Record were false or made recklessly, as a positive assertion, without knowledge of the truth, or that the nondisclosure of material facts would induce ALSF into certain actions or inactions. ALSF relied upon Redline's misrepresentations and/or nondisclosures to

ALSF's detriment and has been damaged as a result.   ALSF seeks to recover both actual and exemplary damages as a result of this fraud.

**Count Four:**
**Conversion**

59.   The factual allegations of paragraphs 1 through 46 are incorporated by reference.

60.   Redline, acting in concert with its CFO Ron Record and others, wrongfully exercised dominion and control over personal property belonging to ALSF, including confidential information such as customer prospect lists and financial data, and ALSF has been damaged as a result.   ALSF is entitled to recover not only its actual damages, but also exemplary damages because the conduct of was of a wanton and malicious nature.

**Count Five:**
**Theft Liability**

61.   The factual allegations of paragraphs 1 through 46 are incorporated by reference.

62.   Redline and others acting in concert with Redline unlawfully appropriated, secured, or stole ALSF's property and services with the intent to deprive ALSF of its property and/or to avoid payment for services and are accordingly liable for their misconduct for actual damages suffered by ALSF.

**Count Six:**
**Misappropriation of Trade Secrets**
**And Conspiracy to Misappropriate Trade Secrets**

63.   The factual allegations of paragraphs 1 through 46 are incorporated by reference.

64.   Redline and others acting in concert with Redline have misappropriated ALSF's trade secrets.   Redline has accessed, used and/or disclosed

ALSF's trade secrets, including but not limited to prospect lists, marketing materials and internal company work product, without ALSF's express or implied consent and with knowledge that they had a duty to maintain the secrecy of the proprietary information and/or limit its use.

65.     ALSF seeks to recover all damages caused by the misappropriation, including but not limited to actual loss caused by the misappropriation and unjust enrichment caused by the misappropriation.   Alternatively, ALSF seeks a reasonable royalty for Redline's unauthorized use or disclosure of ALSF's trade secrets, including but not limited to its business work product and prospective customer sales lists.

66.     To the extent that the misappropriation is found to be willful and malicious, ALSF additionally seeks an award of exemplary damages.

**Count Seven:**
**Tortious Interference with Existing Contract and**
**Tortious Interference with Prospective Relations**

67.     The factual allegations of paragraphs 1 through 46 are incorporated by reference.

68.     ALSF had both existing and prospective contractual relationships with its franchisees and regional developers. ALSF also had prospective relationships with franchise sales leads and prospects. Such relationships and the information related to them were confidential and protected as ALSF's sole property under the JV Agreement. Nevertheless, Redline knowingly acted to misappropriate ALSF's confidential sales prospect lists and internal marketing data for its own benefit.

69.     ALSF seeks to recover all damages caused by the tortious interference with existing and prospective contract relationships by Redline, including but not limited to actual loss caused by the diversion of franchising prospects to their other business concepts, lost profits of ALSF, and recovery of Redline's profits obtained through its unlawful actions against ALSF.   To the extent that the tortious interference is

found to be willful and malicious, ALSF additionally seeks an award of exemplary damages.

### Count Eight:
### Breach of Contract:

70.     The factual allegations of paragraphs 1 through 46 are incorporated by reference.

71.     As set forth above, as an affiliate of TLG through commonality of ownership and control with Ron Record, John Leonesio and UCS, Redline was contractually obligated to ALSF pursuant to the confidentiality covenants to exercise reasonable protection of ALSF's confidential business information. Despite such obligations, Redline breached its obligations to ALSF under the JV Agreement, and ALSF has suffered damages as a direct result of the breaches.  ALSF is entitled to recover its actual economic damages. Additionally, because the JV Agreement and relationships thereunder are governed by Texas law, ALSF is entitled to recover its reasonable costs, including attorney's fees and costs, under section 3.11 of the JV Agreement and under section 38.001 of the Texas Civil Practice and Remedies Code.

### Conclusion and Prayer

For these reasons, ALSF respectfully requests that the Court set this matter for hearing, and that upon hearing, grant ALSF all relief to which it is entitled, including actual damages, exemplary damages for Redline's knowing and intentional misconduct, pre- and post-judgment interest as allowed by law, costs, and reasonable attorney's fees, together with all other relief ALSF may show itself entitled.

1       DATED this 16th day of September 2016.

2                             JONES, SKELTON & HOCHULI, P.L.C.

3

4                        By  /s/  Georgia A. Staton

5                          Georgia A. Staton
Robert R. Berk

6                          40 North Central Avenue, Suite 2700
Phoenix, Arizona  85004

7                          Attorneys for Defendant Amazing Lash
Studio Franchise, LLC and Grant Walsh

8

9                      **CERTIFICATE OF SERVICE**

10       I hereby certify that on this 16th day of September 2016, I caused the

foregoing document to be filed electronically with the Clerk of Court through the

CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF

system.

/s/  Cheryl E. Diaz